UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JOHN J. O'BRIEN,<br><br>   Plaintiff,<br><br>V.<br><br>R. PETER ANDERSON and the TRIAL COURT OF MASSACHUSETTS | Civil Action File No.<br>03-11356 GAO |

**DEFENDANT TRIAL COURT OF MASSACHUSETTS' MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

I. **INTRODUCTION**

The Defendant Trial Court of Massachusetts (the "Trial Court") respectfully submits this Memorandum in Support of its Motion to Dismiss for Failure to State a Claim pursuant to Fed. R. Civ. P. 12(b)(6). Plaintiff John J. O'Brien's[1] Complaint fails as a matter of law where (i) the Plaintiff cannot establish that the Trial Court owed him a legal duty, that it breached its duty, or that the breach caused Commissioner O'Brien's alleged harm (incarceration as a result of his refusal to comply with a court order); (ii) the Trial Court (via the Massachusetts Chief Justice for Administration and Management "CJAM") had *no authority* to interfere with a contempt proceeding by a Massachusetts District Court judge against Commissioner O'Brien for failure to comply with a court order; and (iii) Section 10(b) of the Massachusetts Tort Claims Act bars Plaintiff's claim because the alleged negligent conduct of the Trial Court – failure to administratively resolve the drug-testing dispute - was a discretionary function.

---

[1] The plaintiff, John J. O'Brien, is the Commissioner of Probation for the Commonwealth of Massachusetts.

The filing of this lawsuit is an unfortunate continuation of a dispute the Commissioner of Probation, John J. O'Brien, had with a Massachusetts District Court judge, Honorable R. Peter Anderson, when Judge Anderson issued an Order requiring a specific method of drug-testing for certain criminal defendants in the drug court session of the Brighton District Court. After realizing that the Commissioner was not complying with the conditions of his sentencing Order, Judge Anderson ordered Commissioner O'Brien to appear before the court to show cause why he should not be held in civil contempt for his failure to comply.

Despite the CJAM's efforts in attempting to negotiate an administrative resolution to the dispute and despite the fact that the CJAM specifically advised Commissioner O'Brien to "comply" with Judge Anderson's Orders until the dispute was resolved, Commissioner O'Brien responded by arguing at the contempt hearing that he would not comply, that the court did not have the legal authority to order a specific drug testing method, and that the court did not have the authority to issue an Order of Contempt against him. As a result, Judge Anderson ordered Commissioner O'Brien held civilly in confinement and fined him. Commissioner O'Brien immediately thereafter agreed to fully comply with the Order of the District Court. When Commissioner O'Brien appealed the decision, the Massachusetts Supreme Judicial Court "expressed an opinion" (to the then-moot issue) and stated that, in the future, Commissioner O'Brien should work together with the CJAM and "support" the drug court session. See Supreme Judicial Court Decision, attached hereto as Exhibit A.[2]

---

[2] Ordinarily, in ruling on a motion to dismiss, a court may not consider any documents that are not incorporated into or made an exhibit to the complaint, unless the motion is converted to one for summary judgment. Alternative Energy v. St. Paul Fire & Marine, 267 F.3d 30, 33 (1st Cir. 2001)(citation omitted). However, an exception may be made for documents the authenticity of which are not disputed by the

Now, after having lost his legal argument, Commissioner O'Brien seeks to continue his dispute by filing this lawsuit not only against Judge Anderson, but also against the Trial Court, apparently claiming, for the first time, that the Trial Court through the CJAM negligently supervised Judge Anderson. For the reason as discussed more fully below, Commissioner O'Brien's claim must fail.

## II. FACTS

### Sentencing and Drug Testing

Massachusetts General Laws Chapter 211F § 3(a) authorizes Massachusetts state court judges to sentence criminal defendants to community corrections programs: "[a]ny court exercising jurisdiction is authorized to sentence any eligible offender to a community corrections program." Id. Additionally, the statute also authorizes the court to set the duration and conditions of the sentence – conditions which include drug testing: "[t]he court may dictate the duration and conditions of the sentence in a community corrections program..." Id. at Section 3(b).

On November 27, 2001, pursuant to its responsibilities to "plan" and "make" policy concerning administrative matters of the Trial Court and as a result of various budget cuts at the state-level, Barbara A. Dortch-Okara, the Chief Justice for Administration and Management of the Trial Court, forwarded a memorandum to the Commissioner of Probation's office advising that the funding in an account covering "Non Employee Services" was "$1.8 million less than needed to cover costs for services related to...drug testing." The CJAM "welcome[d] suggestions...to reduce these

---

parties; for public records; for documents central to plaintiff's claim; or for documents sufficiently referred to in the complaint." Id. (quoting Watterson v. Page, 987 F.2d 1,3 (1st Cir. 1993). Here, the SJC decision qualifies as an exception.

3

expenses without delaying the processing of cases." <u>See</u> Plaintiff's Complaint, <u>Exhibit A</u>.

On December 11, 2001, the Commissioner's office issued a memorandum internally that reflected a change in drug testing protocols including testing of "Level II" probationers only twice a month and which testing would terminate if the probationer submitted negative test samples for ninety (90) consecutive days. <u>See</u> Plaintiff's Complaint, <u>Exhibit B</u>. The memorandum stated that this change *"anticipates the challenges we [the commissioner's office] may face in meeting the needs of the court."* <u>Id.</u> (emphasis supplied).

On January 23, 2002, Chief Justice Dortch-Okara issued the Trial Court Policy for Drug Court Session Memorandum to Commissioner O'Brien with a letter stating "I have refrained from addressing in the Policy Statement certain issues of a more detailed nature…in the belief that such issues might be more effectively addressed at the departmental or local level with, where appropriate, coordination with the Office of Community Corrections." <u>See</u> Plaintiff's Complaint, <u>Exhibit C</u>. Consistent with G.L. c. 211F § 3 in recognizing the court's role in setting forth the sentencing conditions of drug-related convicts and overseeing their treatment, the Trial Court Policy states specifically that *"drug court sessions* and the Office of Community Corrections shall coordinate their activities and work cooperatively in *providing substance abuse treatment and oversight to defendants."* <u>See</u> Plaintiff's Complaint, <u>Exhibit C</u> (emphasis supplied).

### The Dispute Between Commissioner O'Brien and Judge Anderson

In 1998, various criminal complaints related to drug offenses were filed in the Brighton and Roxbury Division of the District Court in the "drug sessions" of those

4

courts. See Exhibit A (SJC Decision). The criminal defendants were convicted. Id. In January 2002, pursuant to G.L. c. 211F § 3(b) as described above, Judge Anderson sentenced the defendants to "Level II" community corrections programs as a condition of probation and ordered the defendants to be tested randomly for drugs at specified intervals by the Office of Community Corrections that operates the community corrections programs pursuant to G.L. c. 211F § 2. See Plaintiff's Complaint, Exhibit D. Judge Anderson wrote:

> I order the Office of Community Corrections to conduct random drug testing at least one time per week until December 20, 2002 or further order of the court. I further order that all results, positive and negative, be reported to the Brighton Probation Department by noon each Tuesday.

Id.

Soon thereafter, Judge Anderson recognized that, for reasons identified by the Commissioner in his December 11th memorandum, the Commissioner's office was not executing these sentences pursuant to his order. See Plaintiff's Complaint, Exhibit E. This led to a series of hearings at which Judge Anderson required the Commissioner to attend. See id.; Plaintiff's Complaint, ¶¶ 13, 26, 29, 30, 32-36. The Supreme Judicial Court summarized the dispute between Judge Anderson and Commissioner O'Brien as follows:

> From the beginning it was the position of the commissioner that the issues of method, frequency, and location of testing were issues of allocation of resources, and were within his discretion to decide, any dispute being resolved in the first instance by the CJAM as an administrative matter. The judge's order was not lawful, in the commissioner's view, and, in any event, it was not appropriate for the judge to use his contempt power to force the commissioner to allocate resources differently from the manner the commissioner wished. The judge, however, defined the issue as one that went to the heart of his judicial authority, and believed that the commissioner's conduct was insubordinate and that his representations to the court were designed to mislead. He rejected the proposed drug testing alternatives as being of inferior quality.

5

See Exhibit A, (SJC Decision). Simply stated, the Judge wanted a certain type of drug test at a certain periodicity. Commissioner O'Brien substituted another type of test that was less expensive and arguably less expensive.

Once the dispute arose, beginning in April 2002 and prior to Judge Anderson's contempt order of April 25th, Commissioner O'Brien received legal representation from the Office of the Attorney General of the Commonwealth of Massachusetts. See Plaintiff's Complaint, Exhibit S.

On April 25, 2002, Judge Anderson found Commissioner O'Brien in contempt of a court order, held him in "civil jail," and fined him one hundred dollars ($100) a day until he complied. See Plaintiff's Complaint at ¶ 36. Judge Anderson found:

> John O'Brien…deliberately misled this court to believe that he was complying with certain conditions of drug testing to which he had agreed as a condition of this court granting him continuances of a show cause hearing. On April 25th, I invited the Commissioner to restore status quo ante by complying with the already agreed conditions. He flatly refused. His refusal was not predicated on the inability to comply but solely on his belief that this court has no authority to set the duration and conditions of a sentence to the Office of Community Corrections.

See Court Order, attached hereto as Exhibit B.[3] After he was jailed, the Commissioner "quickly complied." Exhibit A, (SJC Order). Commissioner O'Brien appealed Judge Anderson's Order and the SJC granted direct appellate review. Id. Although Commissioner O'Brien's appeal was moot by the time the SJC reached it (the probationers had completed the program), the SJC "expressed an opinion" that "[w]e trust that the commissioner, under the supervision of the CJAM, will devise a means of providing the type, frequency, and duration of drug testing necessary to support the mission of the drug court session." Id.

---

[3] For the same reasons as noted above concerning the SJC decision, the Court may also consider Judge Anderson's Order without converting the instant motion into one for summary judgment.

CJAM's Role in Dispute

The CJAM has statutorily-defined authority under G.L. c. 211B § 9. ("Powers and Duties of the Chief Justice for Administration and Management") Id. Chapter 211B § 9 states that "the chief justice for administration and management ...shall have general superintendence of the *administration* of the trial court...[and] shall be the *administrative* head of the trial court of the commonwealth...[and] shall be responsible for the management of court personnel, facilities, administration, security, and court business and shall have the authority necessary to carry out these responsibilities...[including] the responsibility to provide *planning and policy making functions*, including i*mplementation of such planning and policy making decisions*." Id. (emphasis supplied).

Pursuant to its authority, in March and April 2002, Chief Justice Dortch-Okara attempted to resolve the dispute between Judge Anderson and Commissioner O'Brien administratively by writing letters (see Plaintiff's Complaint, Exhibits J, and K), filing motions (see Plaintiff's Complaint, Exhibits L and P), and convening meetings (Plaintiff's Complaint, ¶ 25). Indeed, Chief Justice Dortch-Okara memorialized her advice to Commissioner O'Brien in a March 18th letter advising: "[u]ntil this controversy is resolved, you are hereby directed...to enforce compliance by the Office of Community Corrections with these testing orders as entered by the court [Judge Anderson's orders] or devise some substitute testing plan acceptable to the court." Plaintiff's Complaint, Exhibit K.

In the end, however, Commissioner O'Brien decided not to follow the directive from Chief Justice Dortch-Okara and, with advice from counsel, continued to refuse to comply with the court's Order. No statute, policy or precedent allowed or authorized

7

CJAM Dortch-Okara on behalf of the Trial Court to interfere with Judge Anderson's authority to set the conditions of sentences pursuant to Chapter 211F § 3 or issue contempt orders.

### III. STANDARD FOR REVIEW

In adjudicating motions to dismiss under Fed. R. Civ. P. 12(b)(6) the Court must accept all allegations in the complaint as true and all reasonable inferences must be drawn in favor of the plaintiff. See Rockwell v. Cape Cod Hosp., 26 F.3d 254, 255 (1st Cir. 1994). However, "because only well pleaded facts are taken as true, we will not accept a complainant's unsupported conclusions or interpretations of law." Washington Legal Found. v. Massachusetts Bar Found., 993 F.2d 962, 971 (1st Cir. 1993)(citations omitted). The complaint should be dismissed if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Hishon v. King & Spalding, 467 U.S. 69, 73, 81 L. Ed. 2d 59, 104 S. Ct. 229 (1984).

### IV. ARGUMENT

Plaintiff's Complaint is crafted to suggest that his "hands were tied" because of administrative wrangling and budget cuts and, therefore, he could not comply with Judge Anderson's Orders. In fact, the Commissioner did not comply because he believed that Judge Anderson did not have the authority to order specific drug-testing methods, that the Commissioner alone possessed this authority, and that Judge Anderson was not permitted to issue an Order of Contempt against him. What started out as a budgetary concern in March and early April 2002 – one that the CJAM focused on immediately by writing letters to all concerned and convening meetings - shortly turned into something entirely different: Commissioner O'Brien's legal challenge of the authority of the court. Indeed,

Plaintiff's argument for not complying with the court Order was a legal one – not a budgetary one. Now, having essentially lost his appeal on the legal issue (the SJC appears to have reminded Commissioner O'Brien that his job is to "support" the court – not fight it), Commissioner O'Brien now attempts to describe this as an "administrative" and "budgetary" issue involving the Trial Court when it is not. Accordingly, because Commissioner O'Brien's legal challenge of Judge Anderson's authority has nothing to do with the Trial Court or its role as administrative policy-maker for the trial court departments of Massachusetts, Plaintiff cannot establish his allegations of negligence against the Trial Court, and even if he could, the alleged negligent conduct is clearly a discretionary function of the Trial Court and is protected from liability.

    A.    <u>Plaintiff Cannot Establish The Elements of Its Negligence Claim Against The Trial Court.</u>

Plaintiff's claim must fail as a matter of law because he cannot establish that the Trial Court owed him a duty, that it breached that duty, or that the breach of that duty proximately caused his alleged injury. See <u>Kent v. Commonwealth</u>, 437 Mass. 312 (2002)(negligence consists of duty, breach of duty, and causally related harm).

Here, Plaintiff claims that the Trial Court owed him a statutory duty and breached it:

> M.G.L.A. c. 211D [*sic*] § 9 provides, in relevant parts, that 'the Office of the Chief Administrative Justice shall supervise, establish standards for and monitor...other appropriate operations of the Trial Court.' As such, Chief Justice Dortch-Okara had a duty to Plaintiff to act administratively to prevent the foreseeable incarceration of Plaintiff...[and] was negligent in failing to act to prevent the [Plaintiff's] wrongful incarceration, which she knew or should have known was a foreseeable consequence of Defendant Anderson's contempt proceeding.

Plaintiff's Complaint, ¶¶ 63, 65. Nowhere in Chapter 211B § 9, in the portions quoted or not quoted, does it state that the Trial Court has the authority *to interfere with, overrule, or effect* in any manner a trial judge's sentence or contempt Order. See Pierre v. United States, 741 F. Supp. 306 (D. Mass. 1990)(allowing motion to dismiss on negligent breach of statutory duty claim where plain reading of statute demonstrates inapplicable to case). The plain meaning of Chapter 211B § 9 demonstrates that it intends to establish the CJAM as an entity that handles only the *administration* of the trial court, not specific court decisions. This Court need not be reminded that that is the responsibility of the appellate courts.

Nor does G.L. c. 211B § 9 create a new duty from the CJAM to the Commissioner. See Ribeiro v. Granby, 395 Mass. 608 (1985)(holding that there was no special duty owed to the plaintiff on the ground that there was no intention in the statute to create such cause of action on behalf of the plaintiff). In fact, the only statute related to the sentencing of the criminal defendants at issue (G.L. c. 211F § 3) calls for Judge Anderson to "dictate the duration and conditions of the sentence in a community corrections program," not the CJAM.

If the Trial Court did owe a duty to Commissioner O'Brien, however, Commissioner O'Brien waived it once he took the legal position with advice from counsel that he – not the Court – should establish the methods in which drug court session defendants were to be drug-tested and that Judge Anderson did not have the authority to issue a contempt order against him. Chief Justice Dortch-Okara previously told Commissioner O'Brien in no uncertain terms in its March 18th letter: "[u]ntil this controversy is resolved, you are hereby directed…to enforce compliance by the Office of

10

Community Corrections with these testing orders *as entered by the court* or devise some substitute testing plan *acceptable to the court*." This advice was not heeded by the Commissioner, but was reiterated by the SJC when it said essentially the same thing: "[w]e trust that the commissioner, under the supervision of the CJAM, will devise a means of providing the type, frequency, and duration of drug testing necessary to support the mission of the drug court session."

The Plaintiff also fails to assert any well-pleaded allegations that the Trial Court acted or failed to act in a particular manner that actually constituted a breach. Instead, Plaintiff asserts only that "CJAM Dortch-Okara was negligent in failing to prevent the wrongful incarceration of the Plaintiff." See Plaintiff's Complaint, ¶ 65. This assertion falls well short of describing how, why, or what actions by Chief Justice Dortch-Okara constituted a breach of her duty.

Moreover, Commissioner O'Brien also cannot establish proximate cause as a matter of law. See Wainwright v. Jackson, 291 Mass. 100, 102 (1935)("one cannot be held liable for negligent conduct unless it is causally related to injury of the plaintiff."); Glidden v. Maglio, 430 Mass. 694, 696 (2000)(causation "is an essential element" of proof of negligence). Even if the Trial Court had a duty to mediate the dispute and breached that duty somehow by not resolving the dispute, the Plaintiff simply cannot establish that had the Trial Court tried harder to resolve the dispute, it would have been successful, or that the Plaintiff would not have challenged Judge Anderson's authority, or that Judge Anderson would not have ordered Commissioner O'Brien to be held in contempt of court. Simply put, to say that the same exact scenario would not have happened if Chief Justice Dortch-Okara had somehow tried harder is purely speculative.

11

B. <u>The Massachusetts Torts Claim Act Section 10(b) Bars Plaintiff's Negligence Claim Against The Trial Court Due To The Trial Court's Discretionary Function.</u>

Even if the Court determines that the Trial Court owed a duty, breached the duty, and caused Commissioner O'Brien to be held in contempt, the alleged negligent conduct of the Trial Court was entirely discretionary and, therefore, it is immune from liability pursuant to G.L. c. 210 § 10(b). CJAM's role as "mediator" among the branches of the trial court is an entirely discretionary function in which the CJAM's acts reflect policymaking, planning, and judgment, and not the straightforward implementation of existing policy. See <u>Harry Stoller & Co., Inc. v. City of Lowell</u>, 412 Mass. 139, 142 (1992). As such there can be no liability for damage resulting from CJAM's discretionary actions, even if that discretion was abused.

G.L. c. 211B sets forth in clear terms that the CJAM's powers and duties lie in administrative "planning and policy-making functions...[and] decisions." G.L. c. 211B § 9. Plaintiff's only claim asserted against Defendant Trial Court is for negligence pursuant to the G.L. c. 258 § 10 (Massachusetts Torts Claim Act), which provides an applicable exception to liability where the allegedly tortious act is committed "upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a public employer or public employee, acting within the scope of his office or employment, whether or not the discretion involved is abused." M.G.L. C. 258 § 10(b) (2004).[4]

---

[4] The discretionary function "reflects the Legislature's intention to strike a balance between providing right to individual claimants and protecting public employers against the potentially oppressive cost and inconvenience of defending broad generalized claims based upon allegations of failure to take some remedial action." <u>Gage v. City of Westfield</u>, 26 Mass. App. Ct. 681, 686 (1988).

12

Massachusetts courts have consistently ruled that "discretionary functions" as defined by Section 10(b) are limited to "discretionary conduct that involves policy making or planning" – the exact language that the legislature used to define CJAM's functions and responsibility. See Harry Stoller & Co. v. Lowell, 412 Mass. 139, 141; 587 N.E.2d 780 (1992). While the Supreme Judicial Court has indicated that the scope of the discretionary function exception must be determined on a "case-by-case" basis, it has consistently applied a four-factor test to determine what acts are part of a public actor's discretionary function. See Dobos v. Driscoll, 404 Mass. 634, 651 (1989); Harry Stoller & Co., 412 Mass. 139, 142; Pina V. Commonwealth, 400 Mass. 408, 413 (1987)((i) "was the injury-producing conduct an integral part of governmental policymaking or planning"; (ii) "might the imposition of tort liability jeopardize the quality and efficiency of the governmental process"; (iii) "could a judge or jury review the conduct in question without usurping the power and responsibility of the legislative or executive branches"; and (iv) "is there an alternate remedy available to the injured individual other than an action for damages"). Here, the four factors weigh heavily in the Trial Courts favor.

First, the Massachusetts legislature created the position of CJAM and specifically defined its role as having "the responsibility to provide planning and policy-making functions, including the implementations of such planning and policy-making decisions" involving administrative matters – not deciding legal ones. While the Trial Court contends that the "injury-producing conduct" was actually Commissioner O'Brien's legal challenge of the power of Judge Anderson to issue a contempt order and had nothing to do with administrative matters, arguing *innuendo* – that the injury-producing conduct was CJAM's failure to administratively "prevent" Commissioner O'Brien's incarceration by

13

creating necessary policy – this alleged failure falls squarely in the purview of CJAM's legislative-derived power to "to provide planning and policy-making decisions."

When first notified of a potential problem that was originally a budgetary issue, the CJAM wrote letters, held meetings, and prepared motions attempting to administratively address the concerns. She stated clearly in her March 18th letter to Commissioner O'Brien: "[u]ntil this controversy is resolved, you are hereby directed…to enforce compliance by the Office of Community Corrections with these testing orders as entered by the court or devise some substitute testing plan acceptable to the court." As illustrated in the letters, motions, and meetings attached and referred to in Plaintiff's Complaint, the CJAM attempted to create policy concerning the issue of drug-testing. The transformation from an administrative issue to a legal one took the matter out of CJAM's hands.

Second, the imposition of tort liability would drastically affect CJAM's ability to function. The clear implication of allowing this case to proceed is that the CJAM somehow *can* and *should* become involved with court decisions in specific cases. There is simply no authority for this proposition and, indeed, a finding that CJAM has any authority will not only undermine Massachusetts judges, but add an entire layer of responsibility of the CJAM that was never before contemplated and which would put an immediate halt to the ability of the CJAM to fulfill its real purpose: "the superintendence of the *administration* of the trial court."

Third, a jury or judge could not review these issues without usurping the power and responsibility of the legislature. It was the legislature that created the CJAM and defined its duties as "policy planning" and "policy making." To permit a fact-finder now

14

to re-define what the CJAM'S role is based upon the allegations contained in Plaintiff's complaint would more than usurp the legislature, it would allow the fact-finder rewriting the statute.

Fourth, there was an alternative remedy for Commissioner O'Brien other than this action for damages, and he used it by appealing Judge Anderson's contempt finding to the SJC. See Pina v. Commonwealth, 400 Mass. 408, 413 (court rejected negligence claim based on Disability Determination Service's handling of a disability claim, in part, because "there is obviously 'an alternate remedy available to the injured individual other than an action for damages,' – the statutorily provided appeal process"). The legal question on appeal was, did Judge Anderson overstep his authority by insisting on a particular drug-testing method and by issuing a contempt order against Commissioner O'Brien. And, despite the issue being moot, the SJC "expressed an opinion" on the matter that Commissioner O'Brien was to "support" the court in its orders, hinting that if this matter resurfaced, the SJC was likely to side with Judge Anderson.

Not only does the four-prong analysis favor dismissal of the case against the Trial Court, but a review of how Massachusetts courts have applied the test further supports granting this motion. For example, the discretionary function exception is often raised as a defense in cases where a supervisor was allegedly negligent in supervising subordinates who committed intentional torts that could have been prevented by adequate supervision.[5] In Dobos v. Driscoll, 404 Mass. 634, the SJC rejected the §10(b) defense where a highway patrol supervisor failed to properly discipline a highway patrol officer with a history of abusive behavior; as a result of that failure the patrolman returned to the job and promptly abused another driver. The court held that the supervisor failed to follow

---

[5] Justices of the Trial Court are appointed individually and are not under the supervision of the CJAM.

15

established protocol regarding the disciplining of wayward officers. Id. at 651. The court reasoned that finding liability would not interfere with "the operation of police disciplinary policy or procedures. Rather, it is the failure to follow established procedures that was tested by the jury." Id. at 653.

However, in the absence of clear disciplinary policies and procedures, the courts have held that the Commonwealth cannot be found liable for a supervisor's inadequate supervision. In Wightman v. Town of Methuen, 26 Mass. App. Ct. 279 (1988), the court reaffirmed its position that schoolyard supervision and discipline by school employees was a discretionary function not subject to liability. Id. at 280. "Acts by which school authorities maintain decorum... are a matter of broad discretion." *Id.* (citing Cady v. Plymouth-Carver Regional Sch. Dist., 17 Mass. App. Ct. 211 (1983)).

The CJAM's function as administrator of the Trial Court is closer to the situation of the school employees than the police supervisors. Unlike in Dobos, the CJAM has no set protocol or procedure for adjudicating disputes among members of the Trial Court. There is no fixed policy for mediating such disputes as there is for disciplining and monitoring abusive police officers. The CJAM's administrative activities reflect individualized policy-based decision, akin to schoolyard discipline. Especially given the fiscal crisis faced by the Trial Court in the relevant time period, negotiating divisive disputes regarding the allocation of limited funds is a delicate balancing act that requires policy acumen and sensitivity. It is not akin to keeping an eye on a troubled police officer, but instead, it is like the delicate work of a Chief Executive who must balance competing concerns and allocate limited resources, who, as a result of that discretionary authority, enjoys broad immunity regarding the decisions he makes.

The SJC provided a useful sample of governmental functions that would be covered by the exception. In Harry Stoller & Co. v. City of Lowell, 412 Mass. 139, the SJC found that city was not immune from suit based on firefighter's failure to use a building's existing sprinkler system to fight a fire. In doing so, the court noted that while that decision was not part of the fire department's discretionary function, many other aspects of firefighting would be immune from suit, "especially the allocation of financial resources" and "determination of what property to attempt to save because the resources available to combat a conflagration are or seem to be insufficient to save all threatened property. In such cases, policy determinations might be involved, and application of the discretionary function exception would be required." Id. at 145. Again, the CJAM's role in adjudicating disputes among Trial Court officials, especially regarding the allocation of resources, is a highly discretionary one that involves primarily policy determinations. As such, application of the discretionary function exception "would be required."

As mentioned above, once the function is determined to be discretionary, it does not matter whether the government actor abused that discretion. M.G.L. c. 258 § 10(b); J.K. v. Commonwealth, 28 Mass. App. Ct. 766 (1990) ("That the discretion conferred may have been abused is of no matter. It is the nature of the governmental act, not the care with which it is performed, that determines whether the exception applies."). Even if Chief Justice Dortch-Okara should have taken a more active role in the mediation of this dispute, her failure to do so could not be actionable.

Chief Justice Dortch-Okara did not simply ignore plaintiff's requests for assistance. Indeed, after Chief Justice Dortch-Okara first announced that disputes should be administratively handled by her office, she sent a letter dated March 18, 2002, which

ordered the plaintiff to enforce compliance with Judge Anderson's Orders or present an alternative plan acceptable to the court. See Plaintiff's Complaint, Exhibit K. Plaintiff then went back to Judge Anderson and presented a plan with which he complied until April 1, 2002. However, after that point, the drug testing contract with the private vendor was cancelled, and the plaintiff failed to maintain compliance with the Trial Court's Order and failed to seek a modification of that Order and failed to notify the Court that its Order was no longer being obeyed. The Plaintiff may have been disappointed with the CJAM's ongoing administration of this conflict, but she did in fact lead the administrative process and handle the dispute, though not to the satisfaction of the Plaintiff. There was no procedure, policy or other roadmap about how to mediate this dispute. It was purely discretionary. See contra Sena v. Commonwealth, 417 Mass. 250 (1994)(no discretionary function when police officer violated officially established departmental procedure).

The plaintiff can have no cause of action based on the CJAM's failure to mediate the dispute to his satisfaction. The CJAM issued an order to the plaintiff. He failed to comply with that order. To the extent that it is within the CJAM's discretion to mediate such a dispute, she did so. Any damages that accrue from those acts are immune from suit as part of her discretionary function in administering the Trial Court and its finances.

C. The Trial Court Is Also Protected From Plaintiff's Claims By Doctrine of Judicial Immunity.

The "discretionary function" of the CJAM dovetails with the immunity enjoyed by judges. Judges are immune from suit based on their judicial decisions because they must enjoy broad discretion in issuing their opinions. See e.g. Mireles v. Waco, 502 U.S. 9 (1991) (outlining the scope of judicial immunity). Holding the CJAM (who is not a

18

defendant) (and vicariously the Trial Court) (which is a defendant) liable for a trial judge's decision would greatly infringe on the immunity enjoyed by judges. If judge's decisions, even as agents, are subject to suit through the indirect channel proposed by the plaintiff, judge's discretion would be hampered as they would have to fear the prospect of their superiors and employers facing suit based on their judicial decisions. See Id. Neither the CJAM (or her principal the Trial Court) nor the Judge himself can be held civilly liable for a judicial decision. See Id. Relief from judicial decision is available exclusively through the appellate process.

## V. CONCLUSION

For the foregoing reasons, the Trial Court respectfully requests that this Court grant Trial Court's Motion to Dismiss by entering judgment in its favor and against Commissioner O'Brien on all counts of the Complaint.

TRIAL COURT OF MASSACHUSETTS,

By its attorneys,

J. Owen Todd (BBO# 499480)
Todd & Weld LLP
28 State Street
Boston, MA 02109
(617) 720-2626

August 12, 2004

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail-hand on 8/12/04